Filed 11/3/21  In re Ariana G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ARIANA G., a Person Coming Under the Juvenile Court Law. | B310511 (Los Angeles County Super. Ct. No. 17CCJP01801) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MANUEL G.,<br><br>Defendant and Appellant. | |

| In re ARIANA G., a Person Coming Under the Juvenile Court Law. | B311415 (Los Angeles County Super. Ct. No. 17CCJP01801) |
| --- | --- |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MELISSA H., Defendant and Appellant. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING NO CHANGE IN JUDGMENT |

THE COURT:

The opinion herein, filed on October 6, 2021, is modified as follows:

1. On page 28, in the second paragraph, delete the last two sentences. After the fifth sentence that ends with "parental figure," add footnote 2 as follows:

[2] In considering the existence of a beneficial relationship, *Caden C.* permits courts to "consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra*, 11 Cal.5th at p. 632.) This includes consideration of the "'amount of "comfort, nourishment or physical care" [the parent] provided'" to the child during visits. (*Ibid.*) Thus, *Caden C.* does not preclude consideration of the extent to which a parent fulfills a parental role in the child's life. A parental bond between a parent and child will normally be stronger and more significant than that of a playmate—therefore the question of

2

whether the bond between the parent and child is parental in nature remains valid.

2.  On page 30, in the second paragraph following II.C., after the second sentence that ends with "multiple times," add footnote 3 as follows:

**3**      *Caden C.* points out that "when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency." (*Caden C., supra*, 11 Cal.5th at p. 637.)  Thus, the *Caden C.* court rejected the "paradoxical proposition" that "the exception can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency." (*Ibid.*)  However, the *Caden C.* court acknowledged that "a parent's struggles with substance abuse, . . . or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Id.* at p. 639.)  Here, the parents' failure to address the issues that led to the dependency are relevant to the question of detriment not only because the parents engaged in domestic violence in Ariana's presence but because there was evidence that the parents' inability to resolve their issues caused disruptions in her placement and had a negative effect on her wellbeing.

3.  On page 32, in the first full paragraph, delete the last sentence that starts with "Instead."

4.  On page 36, in the first paragraph after III.B., delete the third and fourth sentences with their respective citations and replace them with the following sentence:

3

Instead, she was required to show that her contact with the child has "'developed a significant, positive, emotional attachment.'" (*Id.* at p. 1419.)

Appellant Manuel G.'s petition for rehearing is denied. Appellant Melissa H.'s petition for rehearing is denied. There is no change in the judgment.

_____     _____     _____

LUI, P. J.     ASHMANN-GERST, J.     CHAVEZ, J.

4

Filed 10/6/21  In re Ariana G. CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ARIANA G., a Person Coming Under the Juvenile Court Law. | B310511 (Los Angeles County Super. Ct. No. 17CCJP01801) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL G.,<br><br>    Defendant and Appellant. | |

| In re ARIANA G., a Person Coming Under the Juvenile Court Law. | B311415 (Los Angeles County Super. Ct. No. 17CCJP01801) |
|---|---|
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MELISSA H., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Brett Bianco, Judge. Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant Manuel G.

Carol A. Koenig, under appointment by the Court of Appeal, for Defendant and Appellant Melissa H.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Manuel G. (father) and Melissa H. (mother) have filed separate, concurrent appeals challenging termination of their parental rights to their daughter Ariana G. (born September 2017). Because the facts and legal arguments overlap, we

address the two appeals together in this single opinion. Both parents argue that the juvenile court erred in declining to apply the beneficial relationship exception to termination of parental rights found in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] Neither father nor mother has shown that the juvenile court's factual determinations lacked substantial evidence or that the juvenile court abused its discretion in balancing the factors concerning detriment to the child. Therefore, we find no error and affirm the juvenile court's order terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND
**The Family**

The family consists of father, mother and Ariana. The parents never married. Mother has a son (born July 2003), who resides with his maternal aunt through a family court legal guardianship. Mother voluntarily agreed to this arrangement because she was unable to obtain adequate housing.

Mother's prior child welfare history with her older child included referrals from 2006 through 2017. The four referrals during this time alleged that mother physically abused, emotionally abused, or neglected her son. The referrals were either closed due to mother's situation becoming stable or deemed inconclusive.

Mother and father both have criminal histories. Mother's criminal history is extensive, including convictions for driving while her license was suspended, vandalism, and arrests for

---

[1] All further statutory references are to the Welfare and Institutions Code.

3

infliction of corporal injury on a spouse/cohabitant and violation of a protective order.  Father's criminal history includes a 2017 arrest for battery on a spouse/ex-spouse.  He also has arrests and convictions from 2007 to 2011 for driving while his license was suspended.

**Referral and initial investigation in the present matter**

On October 19, 2017, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that mother neglected one-month-old Ariana by smoking marijuana, drinking beer, and using her welfare money to buy marijuana and beer.

The investigating social worker obtained a call log from the referral address and noted that there were four calls made to law enforcement for domestic violence in December 2016.

Mother permitted the social worker to enter her home on October 24, 2017, for a face-to-face interview.  Mother lived with maternal grandfather (MGF) in his studio apartment.  Mother believed that father made the referral, stating that father told her via text message that he would be calling DCFS.  Mother believed that father did this in retaliation because she left his home and would not return.  Mother described father as "possessive" and "manipulative."  Mother admitted to prior domestic violence with father, and stated that she intended to obtain a permanent restraining order against him by the end of the week.  Mother reported that father called DCFS with false reports because he was trying to obtain custody of their child and because she had ended their romantic relationship.  Mother had a temporary restraining order against father, but admitted that they continued to contact each other in violation of the order.

4

Mother agreed to and signed a safety plan that day. The safety plan provided that no one transporting or caring for Ariana would be under the influence of any substances, and the parents would comply with any existing court orders regarding domestic violence. The safety plan lasted for 30 days or until closure of the referral.

In a telephone conversation with the social worker on October 24, 2017, father expressed concern that mother was both exposing the child to marijuana smoke and was a violent individual. Father stated that there had not been any violence in the past month because mother was not allowing father to visit the child. The social worker informed father that DCFS was investigating the matter and both parents would be asked to test for drugs. Father agreed but admitted to smoking marijuana, offering to provide his medical marijuana card.

At a subsequent in-person interview father denied smoking marijuana since Ariana was born. When asked about the parents' incidence of domestic violence in May 2017, father stated that mother was to blame because she could not control her anger. As a result of the incident, father had enrolled in domestic violence classes and was on probation. Father said he had to call law enforcement on mother several times, that he had a restraining order against mother, but admitted that both parties violated the order. Father claimed they were trying to figure out their relationship now that they had a child. Father alleged that mother was not fit to take care of the child and signed the same safety plan that mother signed.

On October 27, 2017, mother sought a restraining order to protect both her and Ariana from father and for father to have no contact with the child. Two days later father called the social

5

worker and expressed concern regarding Ariana's safety in mother's care.  Father admitted that he and mother continued to violate the restraining orders.  Father added that he would rather have Ariana in foster care than with mother.

Mother called the social worker on November 1, 2017, claiming father had violated the restraining order and came to her home that day.  Mother did not allow father in the house and called law enforcement.  Mother also informed the social worker that MGF wanted her to move due to the issues she had with father.  The social worker determined that mother was open to going to a shelter and provided information for a shelter intake.

**Section 300 petition and detention**

On November 14, 2017, DCFS filed a section 300 petition on behalf of Ariana alleging that she was at risk of serious physical harm as a result of mother and father's history of engaging in violent altercations in the child's home and by violating a criminal protective order.  It was further alleged that father had a history of substance abuse, was a current abuser of marijuana and incapable of providing regular care for the child.

The juvenile court ordered Ariana detained from father and released to mother, with father having monitored visitation three times per week.  The court ordered DCFS to provide the parents with appropriate referrals for weekly random drug testing, individual counseling, parenting, and a domestic violence program.

On December 18, 2017, DCFS filed a section 385 petition requesting that Ariana be detained from mother, following the events of December 13, 2017, at which time the parents engaged in domestic violence at father's home while mother was under the influence of alcohol and marijuana.  Law enforcement responded,

6

and mother was arrested for child endangerment and assault with a deadly weapon. Father requested an emergency protective order. Ariana was detained in foster care.

Mother was incarcerated for spousal abuse with pending court dates of December 18 and 19, 2017. Father admitted that he allowed mother and Ariana to live with him so the couple could work things out. Father was adamant that he and mother could resolve their problems even though he acknowledged that mother was violent and drunk at the time of the recent incident. Father thought it was the fault of DCFS for leaving the child with mother. If instead the child had been released to him, he would not have had to deal with mother in order to be with Ariana.

The juvenile court made detention findings and ordered Ariana detained from both parents. Monitored visits for mother three times weekly for three hours per visit were ordered, and father's visits too remained monitored, three times per week for three hours per visit.

**First amended petition, jurisdiction and disposition**

On January 10, 2018, DCFS filed a first amended petition adding allegations surrounding the December 2017 incidence of domestic violence. The petition alleged that Ariana was exposed to violence in which mother punched, slapped, and kicked father multiple times while the child was attached to mother in a baby harness. Mother was arrested and was convicted of willful cruelty to a child on December 27, 2017. She was placed on four years' probation.

In later interviews mother admitted to vandalizing father's car and striking him on December 13, 2017. The dependency investigator observed a videotape of the incident and noted that

7

mother hit father continuously to the point where he fell to the ground.

Father said mother was physically aggressive towards him and denied ever assaulting her. Father thought mother needed domestic violence and anger management counseling. DCFS observed that though a criminal protective order was in place since April 2017, both parents violated the order by continuing to see each other, culminating in the December 2017 incident in the presence of the child.

On January 25, 2018, mother signed a waiver of rights. The juvenile court adjudicated the first amended section 300 petition, sustained the petition as amended by interlineation, declared Ariana a dependent of the court, and removed her from parental custody. The court ordered family reunification services with monitored visitation for the parents three times per week for three hours each visit. The parents were not to visit together. Father's case plan required him to complete a 26-week domestic violence program, eight random or on-demand consecutive drug tests and a full drug rehabilitation program if any test was missed or positive, a parenting program, and individual counseling to address case issues. Mother was ordered to complete a 52-week domestic violence program, five random or on-demand consecutive drug tests, and individual counseling to address case issues.

**First six-month reunification period (January through August 2018)**

On April 11, 2018, father filed a modification petition requesting he be granted unmonitored visits and asking that DCFS terminate weekly drug testing. Since father had completed his 26-week domestic violence program, parenting

8

classes, and five drug tests, on April 26, 2018, the court granted father's modification petition.

Mother also made progress having completed individual counseling, submitted to drug testing, enrolled in a 52-week domestic violence program and a parenting education program, as well as consistently visiting Ariana. Mother progressed from monitored to unmonitored day visits with Ariana.

Ariana had been placed with licensed foster parents M.A. and her husband. Ariana was thriving in her placement. She was well cared for and had formed a bond with her foster parents. Ariana was developing at an age appropriate level, was healthy and appropriately engaged with adults.

Despite the parents' progress, DCFS remained concerned about returning Ariana to their care. DCFS noted that the parents continued to have a contentious relationship and to speak ill of each other. In addition, the parents had not yet had unmonitored overnight visits with Ariana, due to unresolved safety issues including mother obtaining appropriate sleeping accommodations, all adults in both homes being approved, and both homes being free from safety hazards.

**August 2018 six-month review hearing and placement with father**

On August 8, 2018, over DCFS's objection, the juvenile court terminated the suitable placement order and released the child to father with family maintenance services and unannounced home visits by DCFS.

The court also ordered unmonitored visits for mother with the child, including overnight and enhancement services. The court set a progress hearing for November 7, 2018, and a section 364 hearing on February 6, 2019.

9

**August to December 2018, home-of-father placement**

During the last week of August 2018 the parents reported that father allowed mother to reside in his home for approximately one week so that mother could spend more time with Ariana. Father intended to seek amendment of the previous no-contact order to allow peaceful contact between the parents. DCFS held a child family team meeting with mother and father to address the importance of complying with the no-contact order. Father agreed to adhere to the no-contact order. In a separate meeting with mother in September 2018, mother also committed to complying with the court orders and working towards creating a safe home for Ariana.

The parents made more progress in their court-ordered programs. Father completed 36 group sessions of "Project Fatherhood," the 26-week domestic violence program and individual counseling to address case issues, as well as 22 consecutive parenting classes. Mother completed 20 individual therapy sessions, 39 parenting classes, and 32 out of 52 weeks of domestic violence for aggressors.

Father provided the social worker with an updated restraining order dated October 30, 2018, from the superior court allowing peaceful contact between the parents.

On November 16, 2018, DCFS filed a section 388 petition asking the juvenile court to suspend unmonitored visitation for mother. The social worker learned that mother had gone to father's home and attempted suicide by ingesting psychotropic medications in the presence of the sleeping child. This was the second time that mother violated the juvenile court's no-contact order. Father called 911, and mother was admitted to the hospital.

Father later admitted that he and mother were living together from early October 2018 through November 11, 2018, when their last physical altercation occurred.

On November 30, 2018, the juvenile court ordered monitored visitation for mother three times per week.

**December 2018 detention and removal from father's custody**

On December 12, 2018, DCFS detained Ariana from father into foster care. The child was returned to the same foster parents she had resided with previously.

On December 14, 2018, DCFS filed a section 342 petition on behalf of then 15-month-old Ariana alleging that she was at risk due to father's failure to protect her by allowing mother to reside in father's home with unlimited access to the child. The petition alleged that mother was suffering from mental and emotional problems, and father failed to protect the child.

DCFS also filed a section 387 petition alleging the parents had a history of physical altercations and had failed to comply with the juvenile court's order that the parents have no contact with each other.

Father did not understand why the child had been detained from him since he no longer had a relationship with mother, despite admitting that he and mother lived together from October 2018 through November 11, 2018.

DCFS opined that mother had not embraced or implemented any of the tools she learned from the domestic violence program or individual counseling to prevent her from getting into physical altercations with father.

On December 17, 2018, the juvenile court ordered the child detained in foster care under the supervision of DCFS.

11

DCFS filed a jurisdiction/disposition report in advance of the January 31, 2019 hearing. Ariana remained in foster care with the same caregivers. They reported that she was healthy and appeared to have normal mental and emotional development for a child her age. Father and mother were participating in monitored visitation with Ariana in separate locations on separate days.

DCFS observed that Ariana had been detained from father on three different occasions: November 12, 2017, December 14, 2017, and December 12, 2018. The latter two detentions were due to father allowing mother to reside in his home despite a restraining order and a no-contact order in both the criminal court and the juvenile court. On both occasions father stated that he wanted to work on his relationship with mother and believed that she had changed.

DCFS reported that father admitted to having failed to protect the child by allowing mother to be around her. Father expressed that he believed mother was "psychotic" and "suicidal" and therefore unable to take care of Ariana. Father did not want Ariana influenced by mother's actions, stating that mother always "ha[d] to drink something."

Mother denied that she ever tried to commit suicide, but had put all of her pills in her mouth because father tried to take them away from her. Mother reported that father and Ariana came to pick her up when she was released from the hospital on November 15, 2018. When reminded about the no-contact order, mother stated, "As long as he has my daughter, I'm going to be around because he says he can't take care of her on his own."

DCFS noted that the parents continued to contact each other in the presence of the child and were unable to understand

the toxicity of their relationship or implement the skills of peaceful contact to avoid violence. DCFS took the position that the parents needed extra time in their court-ordered programs to learn the importance of implementing the skills learned from these programs before the child could be safely returned to their care.

**January 31, 2019 hearing on DCFS's petitions**

On January 31, 2019, the juvenile court granted DCFS's section 388 petition and ordered mother's visits to remain monitored. The parents pled no contest to the amended section 387 petition. The juvenile court ordered Ariana removed from parental custody with family reunification services in place and monitored visitation three times per week. The parents were not to visit together. They were each ordered to complete several court-ordered programs. The court admonished the parents that they were to have no contact with each other.

**May 2, 2019 progress report and hearing**

Ariana had been in the home of M.A. and her husband from December 14, 2017, through August 8, 2018, when she was placed with father. When Ariana was detained from father on December 14, 2018, father asked if the same caregivers could again care for Ariana. M.A. and her husband were both employed, so Ariana spent time at daycare. The caregivers were attentive and ensured that Ariana was safe. DCFS requested that Ariana be allowed to go on vacation with the caregivers.

Father had completed nine domestic violence classes and 10 individual counseling sessions. He remained consistent with his monitored visits and was attentive to Ariana during the visits. Father informed the social worker that he would not coparent with mother because she was unfit to parent the child.

Mother completed a 52-week domestic violence program, parenting education, and individual therapy. Mother was consistently participating in twice-weekly monitored visits with Ariana. Mother displayed appropriate parenting skills. Ariana seemed comfortable in mother's care and moved towards mother when she needed help.

At the May 2, 2019 progress hearing, the juvenile court ordered unmonitored visitation with Ariana for the parents and gave discretion to DCFS to allow overnight visits.

**August 2019 status review**

DCFS filed a report in anticipation of an August 2019 status review hearing. Ariana remained in foster care with the same caregivers who were providing Ariana with all of her basic needs, including food, shelter, clothing, nurturing, medical care, and access to the parents for visitation.

Mother was living in transitional housing. While at the homeless shelter mother had enrolled in school to study phlebotomy and culinary skills. Mother consistently visited Ariana every Friday.

Father was renting a room that was equipped with a crib for Ariana, a bathroom, and access to a kitchen. Father was working as a driver and could set his own hours.

DCFS held meetings with the parents in June 2019. Father continued to be critical of mother, stating "mother is not fit to be a parent, mother continues to choose drinking before her daughter, my daughter is not safe in mother's care, mother doesn't have anywhere to live with my daughter, I am a better parent because I have a place to stay and a job." Father was defensive with the social workers regarding Ariana's care. For example, when a social worker mentioned that Ariana was

14

returned from a visit with a wet diaper, father stated that the social worker was accusing him of not taking care of his baby. Father was animated, hitting the table with opened hands. When asked why he did not stop to get diapers, father deflected with threats to sue DCFS if he did not get his child back. Father's defensive attitude also arose during a discussion of Ariana's diet. During father's monitored visits Ariana was drinking excessive amounts of juice and eating fruit at the same time and ended up with diarrhea before the end of the visit. When the social worker noted the issue, father stated, "You don't tell me what to do with my baby" and "She's only drinking juice."

During her meetings, mother appeared passive and disconnected. She sat at the end of the table, faced away from the participants, did not engage until asked a question, and sat with her arms crossed and a flat facial expression. Mother seemed focused on blaming father and was provoked when hearing father speak about things mother has done, including drinking and attempting suicide. Mother did not express the positive things she was doing.

DCFS opined that neither parent took responsibility for their own actions, but instead continued to blame each other. The parents had developed a pattern of getting along for a few days, then going back to arguing and fighting. Then father was quick to share all that happened and argue that mother would not be a good parent. During the meetings DCFS social workers attempted to explain this to the parents and try to reach a resolution. After an hour and a half it was clear that the parents were not able to devise a safety plan or supply any ideas that would allow for the child to return to their care. Therefore, DCFS could not recommend that the child return to the parents' care.

Instead, DCFS recommended that the court terminate the parents' reunification services and set a section 366.26 hearing. **DCFS's section 388 petition and September 2019 18-month review and release to parents**

On August 26, 2019, DCFS filed a section 388 petition asking the juvenile court to revert the parents' visitation with Ariana to monitored, after it learned that the parents were visiting the child together in violation of the court's order. The social worker had observed mother and Ariana walking up to father's car. When the social worker addressed the issue with the parents, mother said father had just called her. Father denied that he was present for the purpose of visiting mother and Ariana. He said he just happened to be in the area where mother was visiting and called her. DCFS expressed concern that the parents were visiting the child together in violation of the court's order. Mother also reported that she and father were engaged to be married.

Father informed DCFS that he and mother were attending couple's counseling and were planning to be in a relationship together. Father questioned why DCFS would not allow the parents to visit the child together. Initially father denied that he and mother were engaged, but later admitted that they were. Father also denied that they were living together, but later admitted that they had moved in together on August 20, 2019, were getting along, and had no further issues.

DCFS expressed concern regarding the parents' pattern of disobeying court orders and being dishonest with DCFS.

On September 23, 2019, the juvenile court denied DCFS's section 388 petition and held the 18-month review hearing. The court found that the progress made by the parents had been

16

substantial, that returning the child to the parents would not create a substantial risk to the child, and ordered her released to the parents with family maintenance services.

**Family maintenance September 2019 through June 2020**

In January 2020, the parents were cooperative and Ariana was adjusting well to living with them. The parents were participating in conjoint therapy but stopped participating after moving to San Bernardino. DCFS recommended that the case be transferred to San Bernardino County.

DCFS filed a report for the March 23, 2020 section 364 hearing expressing continued concerns regarding the parents' relationship. On February 10, 2020, father contacted the social worker because there had been an incident which prompted father to contact the police. Father had observed mother jaywalking with Ariana while mother was drunk. Father asked mother to let him take Ariana, but mother refused. Father knew she was drunk and stated that mother had been arrested but was not presently in jail. Father did not then know mother's whereabouts. The social worker contacted mother who was staying at a motel because father would not let her back in the house. Father confirmed that mother had come back to the house but stated that he and his family did not allow her in. They informed her that she could not live there if she was going to be an alcoholic.

The social worker made an unannounced visit to the home. The paternal aunt stated that she had not seen mother drinking on the day of the incident and did not believe mother was drunk that day. The paternal aunt opined that mother and father were not good together. The social worker checked the local police station where it was determined that there had been no calls for

17

service at the parents' address in the past year.  The mother had been arrested due to an outstanding warrant but nothing related to the father's claims.

On March 5, 2020, father informed the social worker that the family had temporarily moved to a motel in El Monte while they looked for affordable housing.  Father stated that the reason they were moving was that the paternal aunt with whom they were residing no longer wanted mother in the home and raised their rent.

On April 16, 2020, the juvenile court continued the section 364 hearing due to the COVID-19 pandemic.

**May 2020 removal from father**

On May 29, 2020, the juvenile court granted an order removing Ariana from father's custody, but denied removal from mother's custody.

DCFS had received multiple messages from mother and father, each accusing the other of various things.  On May 2, 2020, father reported that mother was acting up in the car and almost hit him.  Father reported that mother was an alcoholic and "is out of the picture, she doesn't live here anymore."  Father reported that mother had called the police because mother wanted to take Ariana but father would not let the child go. The police officer who arrived would not allow mother to take the child because she was drunk and did not have a car seat.  Father accused DCFS of failing to do anything about mother's drinking problem.  Father subsequently reported that he allowed mother to spend time with him and Ariana for Mother's Day because mother promised not to drink, and he agreed to give her one more chance.

Mother reported that father pushed her when she tried to say goodbye to Ariana on Mother's Day and that father was lying about her consuming alcohol.

**June 2020 section 342 petition and removal from parents**

On June 3, 2020, DCFS filed another section 342 petition on behalf of then two-year-old Ariana, alleging the child was at risk due to the parents' history of engaging in violent altercations. The petition alleged that on May 11, 2020, mother grabbed Ariana's arm while father held her, and father pushed mother. The petition further alleged that mother had a history of substance abuse and was a current user of alcohol, and father failed to protect the child from mother's conduct.

On June 8, 2020, the juvenile court made detention findings and ordered Ariana into suitable placement under the supervision of DCFS, with monitored visitation for the parents.

On July 29, 2020, DCFS filed a jurisdiction/disposition report. Ariana had been placed in the same foster home where she had previously lived from December 2017 through August 2018, then again from December 2018 through September 2019. DCFS reported that Ariana appeared to have a proper bond with her foster mother, M.A. The child was too young to provide any meaningful statement.

Mother admitted to ongoing violence throughout her relationship with father and that she and father were engaged the last time the court released the child to them (September 2019). After mother ended the relationship with father in May 2020, father would not allow mother to see the child.

Father confirmed that the parents' relationship was "on and off." Father said he tended to resume a relationship with mother because she did not have a place to live, she promised to

19

stop drinking alcohol, and he wanted to raise Ariana in an intact family. The last time they ended their relationship was May 1, 2020, when mother called law enforcement on him. Father stated that DCFS was involved because mother could not control herself, was often under the influence of alcohol, and does not have a stable living environment. Father wanted Ariana released to him and mother stripped of her rights. Father continued to have monitored visits with Ariana, which were going well.

On July 29, 2020, the juvenile court sustained the section 342 petition and removed Ariana from her parents. The child was ordered placed in suitable placement under the supervision of DCFS with monitored visits for the parents.

The court noted that despite the child's young age, the parents were given two and a half years of family reunification services even though the law only entitled the parents to six months of reunification services. The court set a section 366.26 hearing for November 24, 2020.

**Permanency planning**

In November 2020, DCFS reported that Ariana continued to live with the same foster family. She appeared to be comfortable and thriving in the home. Ariana had a good attachment to her caregivers, who were providing her with a loving, stable home. At her three-year-old well-child appointment, no concerns were noted, and she appeared to be developing appropriately. She attended daycare three to five days a week where she was able to follow instructions and interacted with the other children. There were no concerns regarding Ariana's mental and emotional health, with the exception of her being in an agitated state postvisitation with her

parents. Ariana's caregivers were committed to providing her permanency through adoption.

The foster parents noted that visits between Ariana and her parents were difficult on the child. She appeared to be tired and emotionally drained after the monitored visits. She would be grumpy, fussy, and have difficulty going to bed. Ariana would hit, scratch, and bite her four year-old foster sibling. When she saw a marked police car, she would say, "[M]y daddy called the police on my mommy, and mommy was in handcuffs." When she observed arguments on television, she would say, "[T]hey fight like my mommy and daddy." The foster parents believed Ariana was being negatively affected by the extensive visits with her parents, and she was not thriving in her educational growth and development. DCFS recommended that the parents' monitored visits be reduced to weekly two-hour visits and that the matter be continued for six months for a review of the permanent plan hearing.

On November 24, 2020, the juvenile court continued the section 366.26 hearing to complete the adoption readiness. On January 8, 2021, Ariana's foster parents were approved for adoption.

**Contested hearing**

The contested section 366.26 permanency planning hearing was held on February 17 and 18, 2021. Mother and father appeared with counsel via Webex. Father's counsel called father's therapist, father, and the human services aide to testify.

*Therapist*

Father's therapist had seen father since 2018, weekly during periods of high stress, every two weeks during periods of low stress, and every three weeks during periods of extremely low

stress.  Father and the therapist discussed his relationship with mother, father's grief and pain over the loss of custody of his child, and the domestic violence issues.  The therapist felt that father had been successful in using anger management tools to address the domestic violence issues.

The therapist had seen father interact with Ariana once about a year earlier when father brought Ariana to a therapy session.  The child was comfortable with father.  When asked whether it would be detrimental to sever the parental bond between father and Ariana, the therapist replied, "Of course, absolutely.  It always i[s]."  He added that to be raised in the home of a biological parent is always preferable for a child's well-being and mental health.  On cross-examination, the therapist agreed that it was also important for a child to reside in a home that was physically safe.

In answer to the court's question when the parents last engaged in domestic violence, the therapist responded, "August of 2020."  The court observed that this was after father had been seeing the therapist for over two years.

*Father*

Father testified that he was in therapy to address why his child was taken from him, his issues with mother, and their domestic violence.  Father learned that his relationship with mother was toxic and that he needed to set boundaries.  Father was visiting with Ariana every Tuesday and Thursday.

Father testified that when he visited with Ariana, she ran to him and hugged him, calling him "daddy."  Ariana would tell father how much she loved him and that she wanted to go to home with him.  Father stated that his inability to bring Ariana to his home was hurting her as much as it was hurting him.

22

Father testified that he had been visiting regularly, and at the end of the visits, Ariana holds his leg and does not want to let go. Father would bring food, toys, and a tablet to the visits to play learning games. Father had pictures to share of himself and Ariana.

### Human services aide

The human services aide testified that she monitored most of father's visits with Ariana. Father was always prepared for the visits, on time, and had food and toys for Ariana. Ariana was usually happy to see father, and they always greeted each other with hugs. Ariana would say, "Hi daddy" and "I love you daddy." The monitored visits were positive. The human services aide testified that Ariana did not cry at the end of the visits, though there were times when she would hold on to him and tell him she did not want to go home. When father would leave the visits, Ariana would ask for whatever toy or type of food she wanted father to bring to the next visit. She would say, "'Daddy, can you bring me my scooter next time?' Things like that."

### Argument of counsel

DCFS argued that Ariana was adoptable, her foster parents' home was approved for adoption, and DCFS did not believe there was any applicable exception to adoption. DCFS took the position that any benefit Ariana derived from her ongoing parental relationship with mother and father were outweighed by the benefit provided to her through adoption and permanence. Ariana's counsel joined DCFS in requesting that the parental rights of both parents be terminated, noting that any parental benefit would not outweigh her need for permanence. Ariana's counsel observed that while father's visits with Ariana were positive, "that was more of a play/friendship

relationship with the father as she was looking forward to toys and different play interaction with the father rather than a parental relationship." Ariana's counsel further noted that Ariana viewed the caretakers' home as her real home.

Mother's counsel requested that the court not terminate mother's parental rights. She argued that mother had occupied a parental role in the child's life, the two were bonded, and there had never been a lapse in visitation. Father's counsel also argued that parental rights should not be terminated. Father's counsel stated that father had proved that he maintained consistent and regular visits as well as showing that he occupied a parental role in Ariana's life. Father's counsel argued that the therapist's testimony showed that "there's a secured attachment that is essential to the health and development of Ariana's personality structure." Father requested the permanent plan be legal guardianship rather than adoption.

### The court's decision

The juvenile court found that clear and convincing evidence existed that Ariana was adoptable, and that any benefit accruing to the child from her relationship with her parents was outweighed by the physical and emotional benefit she would receive through the permanency of adoption, and that adoption was in the best interest of the child. The court found that no exception to adoption applied, and terminated the parental rights of both parents.

Father and mother separately appealed.

**DISCUSSION**

## I. Applicable law and standard of review

If a court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a permanency planning hearing under section 366.26. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) "[W]hen the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." The goal is to select and implement a permanent plan for the child. (*Ibid.*) "To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them." (*Ibid.*) When it is determined that a child is adoptable, the court "shall" terminate parental rights to allow for adoption. (*Ibid.*; § 366.26, subd. (c)(1).)

If the parent shows that termination of parental rights would be detrimental for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (*Caden C., supra*, 11 Cal.5th at pp. 630-631.) One such exception exists where the juvenile court finds that termination of parental rights would be detrimental to the child and (1) the parents have maintained regular visitation and contact with the child; and (2) the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) Thus, the parent must prove three elements in order to prevail under this exception: (1) regular visitation and contact; (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child. (*Caden C., supra*, at p. 631.) In

assessing whether termination would be detrimental to the child, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Ibid.*)

A substantial evidence standard of review applies to the first two elements of this exception. (*Caden C., supra*, 11 Cal.5th at p. 639.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Id.* at pp. 639-640.) Under the substantial evidence standard, we do not reweigh the evidence. Instead, the juvenile court's factual determinations should be upheld if "'supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Id.* at p. 640.)

The third element—whether termination of parental rights would be detrimental to the child—is different. (*Caden C., supra*, 11 Cal.5th at p. 640.) The "ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion "only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."""" (*Id.* at p. 641.)

## II.    Father's appeal

Father appeals from the order terminating parental rights on the ground that the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i). We discuss each element father was required to prove below.  We find that the evidence below supports the juvenile court's decision, and the court did not abuse its discretion in finding that termination of father's parental rights would not be detrimental to the child.

### A.    *Regular visitation and contact*

Father showed regular visitation and contact during the pendency of this case.  However, father's visits with Ariana reverted back to monitored visits in July 2020 due to the parents' inability to stop engaging in violence in the presence of the child.

Further, regular visitation with the child is only part of the test.  Father was also required to show that the child would benefit from continuing the relationship and that the termination of parental rights would be detrimental to Ariana.  (*Caden C., supra*, 11 Cal.5th at p. 631.)

### B.    *A benefit to the child from continuing the relationship*

In determining whether the parent and child have a beneficial relationship such that parental rights should not be terminated, the juvenile court "must engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family."  (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425.)

27

"Interaction between natural parent and child will always confer some incidental benefit to the child."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Frequent and loving contact is not sufficient to establish the benefit from continuing the relationship contemplated by the statute.  (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)  Instead, the parent must show that he or she "occupied a parental role" in relation to the child.  (*Id.* at p. 1419.)  The beneficial parental relationship exists only where the parent's contact with the child has "'developed a significant, positive, emotional attachment from child to parent.'"  (*Ibid.*)

Substantial evidence in the record suggests that such a relationship did not exist between father and Ariana.  The evidence showed that father and Ariana enjoyed fun, playful visits.  Father would bring food, toys, and a tablet to play games with Ariana.  When the visits ended, Ariana would ask father to bring certain toys or items of food the next time.  This evidence suggested that Ariana looked to father as more of a playmate than a parental figure.  The human services aide testified that Ariana did not cry at the end of the monitored visits.  While the two had positive and loving interactions, the evidence does not suggest that Ariana looked to father to fulfill a parental role.  Instead, there was evidence that Ariana looked to her prospective adoptive parents to fulfill the parental role in her life.  Ariana was appropriately bonded to her prospective adoptive parents, who provided her with a loving, stable home, and acted as her primary caregivers.

Father cites *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*), as a comparable case.  In *Brandon C.*, two boys were declared dependents of the court because they had been the

28

victims of domestic violence.  (*Id.* at p. 1532.)  At the time of the section 366.26 permanency hearing, the mother objected to termination of her parental rights due to her close bond with the children.  The mother testified that she had visited them every week for the past three years, except when she was out of state, and that the boys were happy and affectionate to her when she visited.  Notably, the paternal grandmother agreed that it was not in the boys' best interest to terminate their relationship with the mother and father because they had a good relationship that should continue.  (*Brandon C.*, at p. 1533.)  The juvenile court found that it would be in the children's best interests to maintain the relationship between the minors and the mother, and DCFS appealed.  (*Ibid.*)

On appeal, the *Brandon C.* court gave proper deference to the juvenile court's view of the evidence, noting "[t]he trial court obviously credited the testimony from both mother and grandmother that there was a close bond between mother and the boys, and that a continuation of contact would be beneficial to the children.  DCFS did not present any evidence to the contrary."  (*Brandon C., supra*, 71 Cal.App.4th at p. 1537.)  Here, in contrast, the juvenile court had to weigh conflicting evidence as to the strength and importance of Ariana's bond with father.  While father, and his therapist, testified that it would benefit Ariana to maintain the relationship with father, DCFS presented evidence of insufficient benefit to Ariana from the relationship.  DCFS presented ample evidence that Ariana's bond with her prospective adoptive parents was stronger and more significant in her life, that she was thriving in their care, and that she viewed father as more of a playmate than a parent.  The juvenile court was entitled to credit DCFS's evidence.

The evidence supports the juvenile court's determination that father did not provide Ariana the type of significant, positive emotional attachment required for the section 366.26, subdivision (c)(1)(B)(i) exception to termination of parental rights.

**C.** ***The juvenile court did not abuse its discretion in determining that termination of father's parental rights would not be detrimental to the child***

The final decision by the juvenile court involves a "delicate balancing" of the court's factual determinations regarding the specific features of the child's relationship with the parent and how a "prospective adoptive placement may offset and even counterbalance those harms." (*Caden C., supra*, 11 Cal.5th at p. 640.) In this matter, given the evidence that father's current relationship with Ariana did not rise to the level of a significant, parental relationship, the court found that "any benefit accruing to the child from her relationship with the parents is outweighed by the physical and emotional benefit the child would receive through the permanency and stability of adoption, and that adoption is in the best interest of the child."

The juvenile court had given father many chances in this case to gain permanent custody of Ariana. Father's failure to obey the court's orders that he and mother stay away from each other and refrain from engaging in domestic violence in the child's presence caused Ariana to be detained multiple times. Ariana had returned several times to the home of her prospective adoptive parents, with whom she had appropriately bonded. They provided her with loving care and met all of her needs. In addition, there was evidence that Ariana's visits with her parents were becoming detrimental to her development. She returned

30

from recent visits grumpy, had trouble sleeping, and would assault her foster sibling. The juvenile court was entitled to credit the evidence that severing the parent-child relationship between Ariana and father would not be detrimental to Ariana. Although father's therapist testified that he believed severing the parent-child relationship would be detrimental to Ariana, the court was not required to give weight to this evidence particularly since the therapist had not seen father and Ariana together in a year.

Ariana's caretakers were prepared to give her a permanent, loving and stable home through adoption. "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The juvenile court appropriately used its discretion in determining that providing Ariana this full commitment outweighed the benefit that she would gain through maintaining her pleasant, positive relationship with father. The juvenile court did not exceed the limits of legal discretion by making this reasonable decision. (*Caden C., supra*, 11 Cal.5th at p. 641.)

Father cites several cases in support of his position that his relationship with Ariana rose to the level required for application of the section 366.26, subdivision (c)(1)(B)(i) exception to apply. First, father cites *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) where the father had been his daughter's primary caregiver for the first three and a half years of her life until he was arrested on drug charges. At the 12-month review hearing, the court concluded that the father had complied with every aspect of his case plan, including maintaining sobriety. (*Id.* at p. 293.) In addition to maintaining regular, consistent and appropriate visits

31

throughout the proceedings, the juvenile court found that the father had an "emotionally significant relationship" with his child. (*Id.* at p. 298.) The social worker noted that even after she was removed from his care, the father continued to "'consistently put[] his daughter[']s needs and safety before his own.'" (*Ibid.*) The *S.B.* court concluded, "The record here fully supports the conclusion [the father] continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care." (*Id.* at p. 299.) The court noted that the juvenile court "recognized that S.B. would benefit from continuing her relationship with [her father] and based its decision to terminate parental rights in part on the grandparents' willingness to allow [the father] to continue to visit S.B." (*Id.* at p. 300.) The *S.B.* court did not believe the father should be deprived of his legal relationship with his child based on an unenforceable promise of future visitation by the child's prospective adoptive parents. (*Ibid.*)

The present matter is distinguishable. Ariana did not consistently spend the first three years of her life with father. Instead, she was repeatedly removed from his custody and placed with the foster parents due to the parents' inability to follow court orders and refrain from violence in the child's presence. Further, the juvenile court's decision to terminate parental rights was not based on an unenforceable promise that Ariana continue to be permitted to visit with father. On the contrary, father's visits had recently been reduced due to the negative effects the visits were having on Ariana. Unlike the *S.B.* court, the juvenile court here did not acknowledge an emotionally significant relationship between father and Ariana. Instead, it implicitly concluded that the emotionally significant relationship for Ariana

was the one that existed between Ariana and her prospective adoptive parents.

Father attempts to distinguish this matter from *In re Bailey J.* (2010) 189 Cal.App.4th 1308 (*Bailey J.*). In *Bailey J.*, the court found that a mother's relationship with her child did not rise to the level of that which would support application of the beneficial relationship exception. The court noted that the child was detained when he was two days old and spent no part of his life in his mother's custody. Thus, "[a]t best, mother's supervised interactions with Bailey amounted to little more than play dates for him with a loving adult." (*Id.* at p. 1316.) In contrast, father argues, he had custody of Ariana twice throughout these proceedings, providing Ariana day-to-day care for a total of one year of her life. And when she was not in his custody, father argues, he continued to develop his parental relationship with her through frequent visits.

While father had more time with custody of Ariana than the mother in *Bailey J.*, the evidence before the juvenile court supported a finding that the relationship between father and Ariana did not benefit Ariana such that it outweighed the benefits of adoption. Like the caregivers in *Bailey J.*, Ariana looked to her prospective adoptive parents as the ones who provided for her physical care, nourishment, comfort, affection and stimulation. (*Bailey J., supra*, 189 Cal.App.4th at p. 1316.) In addition, as in *Bailey J.*, there is no basis to find that the juvenile court abused its discretion in finding that the relationship between father and Ariana did not provide a compelling reason to find that termination of parental rights would be detrimental to Ariana. (*Ibid.*)

Finally, father relies on *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*). In *E.T.*, a mother's twins were removed from her care at the age of four months due to mother's mental health issues and drug addiction. After more than a year of reunification services, the children were returned to her care. However, over a year later, mother admitted to her social worker that she had relapsed and needed help and agreed to a safety plan placing the children in the home of their godparents. (*Id.* at p. 71.) Mother relapsed again during the proceedings despite her efforts to overcome her addiction. (*Id.* at p. 74.) By the time of the permanency hearing, the children had lived with their godparents for 24 months of their lives and had lived with mother for 22 months of their lives. The court determined that although the children were "'very tied'" to mother, their relationship with mother was not substantial enough to outweigh the children's need for stability with their godparents. (*Id.* at p. 75.) The *E.T.* court reversed, finding that severing the natural parent/child relationship would deprive the children of a substantial, positive emotional attachment such that they would be greatly harmed. (*Id.* at p. 77.) The court noted, "the twins have a substantial and positive attachment to Mother such that terminating their familial relationship would cause them great harm." (*Ibid.*) As in *S.B.*, the *E.T.* court noted that although the juvenile court likely considered that the mother would still have contact with her children in the future due to her close relationship with the godparents, "'the court cannot nevertheless terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact between the child and a biological parent, even if substantial evidence supports that expectation.'" (*E.T.*, at p. 78.)

34

Finally, the mother's self-reporting of her relapses showed that she recognized when the children were in jeopardy and needed help. Thus, the mother showed insight into her parental responsibilities and was attentive to her children's best interests. (*Ibid.*)

Father points out that like the mother in *E.T.*, Ariana was tied to father and would get emotional when visits ended. However, there was conflicting evidence on this point. The human services aide testified that Ariana did not cry when the visits ended. In addition, she testified that Ariana requested things from father like food items and toys for him to bring to future visits, supporting the conclusion that she viewed him as more of a playmate. Finally, there was evidence that the visits were negatively affecting Ariana's emotional state, as she would come home agitated and her behavior would deteriorate. Unlike *E.T.*, there was no suggestion that the prospective adoptive parents had a close relationship with father that would cause father to be included in Ariana's life in the future. These factual differences between the cases sufficiently distinguish them such that we are not persuaded that we should follow *E.T.* in this case.

Substantial evidence supported the juvenile court's factual determination that father's relationship with Ariana would not benefit Ariana to the extent required for application of the exception to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(i). The juvenile court did not abuse its discretion in finding that termination of father's parental rights would not be detrimental to the child.

## III. Mother's appeal

Like father, mother appeals from the order terminating parental rights on the ground that the juvenile court erred in

35

declining to apply the beneficial parental relationship exception to termination of her parental rights found in section 366.26, subdivision (c)(1)(B)(i).  We discuss each element mother was required to prove below.  As in father's appeal, we find that the evidence below supports the juvenile court's decision, and the court did not abuse its discretion in finding that termination of mother's parental rights would not be detrimental to the child.

### A.     *Regular visitation and contact*

As in father's appeal, the first element of the beneficial parental relationship exception is not at issue in mother's appeal.  DCFS does not dispute that mother maintained consistent visitation throughout the case to the extent that such visitation was permitted.  However, as was the case with father, mother's visits reverted from unmonitored to monitored in July 2020 given the parents' inability to stop engaging in domestic violence in the child's presence.

### B.     *A benefit to the child from continuing the relationship*

Mother's burden of showing a sufficiently beneficial relationship with Ariana was the same as father's.  She was required to show more than frequent and loving contact.  (*In re Beatrice M., supra*, 29 Cal.App.4th at p. 1418.)  Instead, she was required to show that she occupied a parental role in Ariana's life.  (*Id.* at p. 1419.)  Such a parental relationship exists only where the parent's contact with the child has "'developed a significant, positive, emotional attachment.'"  (*Ibid.*)  Substantial evidence supports the juvenile court's decision that this type of significant relationship did not exist between mother and Ariana at the time of termination of parental rights.

36

Like father, mother had pleasant, fun visits with Ariana. Ariana enjoyed the monitored visits, which took place twice weekly. However, mother presented no evidence that Ariana looked to her as a parental figure. In contrast, the evidence showed that Ariana looked to her foster caregivers as her parental figures. Each time that Ariana was redetained from her parents' care, the prospective adoptive parents had recommitted to caring for her. Mother provided no evidence that the bond between mother and Ariana was a significant, emotional attachment that rose to the level of the beneficial parental relationship exception.

In addition, like father, mother had multiple opportunities to reunify with Ariana, only to have her detained again due to the parents' violation of court orders requiring them to stay away from each other and refrain from domestic violence in her presence. Unlike the parents in *S.B., supra*, 164 Cal.App.4th at page 298 and *E.T., supra*, 31 Cal.App.5th at page 78, mother was not able to put Ariana's needs first and stay away from father. This evidence weighed against a finding of a beneficial relationship.

Further, there was evidence that the visits with mother did not benefit Ariana. She would be upset, tired and emotionally drained after her visits with her parents, causing her to act out and have trouble sleeping. Ariana associated her parents with police activity and arguments that she would see on television.

Mother bore the burden of proof in this matter. She presented no evidence of a bonding study, nor did she present any evidence from a therapist or psychologist suggesting that Ariana's bond with her was significant. In contrast, DCFS presented ample evidence that Ariana's bond with her

37

prospective adoptive parents was far stronger and more significant in her life than her relationship with mother. Ariana was thriving in their care. The juvenile court was entitled to credit DCFS's evidence.

Under the circumstances, we find that the evidence supports the juvenile court's determination that mother did not provide the type of significant, positive emotional attachment required for the section 366.26, subdivision (c)(1)(B)(i) exception to termination of parental rights.

C. ***The juvenile court did not abuse its discretion in determining that termination of mother's parental rights would not be detrimental to the child***

The evidence in this matter supported the juvenile court's finding that mother's current relationship with Ariana did not rise to the level of a significant, parental relationship such that the section 366.26, subdivision (c)(1)(B)(i) applied. Given that finding, we cannot find that the juvenile court abused its discretion in finding that "any benefit accruing to the child from her relationship with the parents is outweighed by the physical and emotional benefit the child would receive through the permanency and stability of adoption, and that adoption is in the best interest of the child."

The evidence supporting the juvenile court's reasonable exercise of its discretion on the detriment issue in this matter overlaps with its findings regarding the beneficial relationship. As set forth in detail above, Ariana was detained multiple times from her parents because they violated court orders and continued to engage in violence in Ariana's presence even after participating in court-ordered programs. Ariana was continually

38

placed back in the home of the same foster parents, who became her prospective adoptive parents. While the parents continued to visit with Ariana, the visits began to cause Ariana distress and began to interfere with her normal development. The visits were reduced accordingly. The evidence supports the juvenile court's finding that the prospective adoptive parents were the ones providing Ariana with her daily care, meeting all of her needs, and providing a stable and loving environment. The juvenile court did not abuse its discretion in finding that termination of mother's parental rights would not be detrimental to the child.

**D.** *The juvenile court did not apply the wrong legal standard*

Mother contends that the juvenile court applied an incorrect legal standard when it terminated parental rights. Mother argues that the juvenile court "erroneously combined two standards, part of the third component of the beneficial relationship test, and a best interests standard."

We disagree that the juvenile court erred. The juvenile court specifically found that Ariana was adoptable, that any benefit to the child accruing from her relationship with the parents was outweighed by the physical and emotional benefit she would receive through the permanency and stability of adoption, and that no exceptions were applicable. As part of its ruling, the court noted that "adoption is in the best interest of the child."

The juvenile court did not err in mentioning Ariana's best interests. As set forth in *Caden C., supra*, 11 Cal.5th at page 633, "In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a

39

new family would confer.'" To balance the various factors is a "daunting prospect" for trial courts. (*Id.* at p. 635.) However, as the *Caden C.* court noted, the juvenile court must do its best to act in the child's best interest throughout this difficult decisionmaking. The juvenile court did not err in noting that adoption was in Ariana's best interest, and its reference to Ariana's best interest does not undermine the careful weighing of evidence that the juvenile court appropriately undertook during the section 366.26 proceedings.

**DISPOSITION**

The order is affirmed.

_____
CHAVEZ, J.

We concur:

_____                    _____
LUI, P. J.                                  ASHMANN-GERST, J.